The opinion of the Court was delivered by
Inglis, A. J.
This Court concurs in the conclusion attained by the Commissioner, and affirmed by the Chancellor, that upon the evidence, the negroes, Eose, and her descendants must be held to have been the property of John McLure, and that at his death, they passed under the provisions of,his will to his brother Eobert for the term of his life, and there being therein no further disposition of them, the unbequeathed reversion was in John’s personal representative, aDd upon Eobert’s death, was to be *116 distributed as- intestate property between tbe personal representatives of William and of Robert respectively in equal shares. The reasons assigned by the Chancellor for his judgment in this particular are satisfactory to this Court, and it is not deemed necessary therefore, to add anything to what he has said.
The fact that the negro Caesar, was given by William McLure to his son James, is not disputed. James after the date of the gift, died in the lifetime of his father, and his children the present plaintiffs, are therefore, it is said, claiming directly from their grandfather, and as heirs and distributees, under the statute, to him. But according to the express terms of the statute they take by representation; stand in the place of their father, and “ take the share to which he would have been entitled, had he survived the ancestor,” William, (A. A. 1791, § 1, par. 255, Stat. 162,) and they must take it as he would have taken it. As fhus representing him, they have an election to come in and participate in the distribution of their grandfather’s estate, or to stand out at their pleasure. (Hamer vs. Hamer, 4 Strob. 124.) But if they elect to come in, the requirement of the statute is positive. No Court has any power to relieve them from this obligation ; it was fastened upon their father when the gift was made, and the subsequent loss of the property could not discharge it. The case presented does not call for more than this. It is said in McCaw vs. Blewitt, (2 McC. Ch. 90). “ By hotch-pot is meant, that each child is to draw at the death of the parent an equal proportion.” (See Ison vs. Ison, 5 Rich. 15.) And in Manning vs. Manning, (12 Rich. Eq. 428,) this Court said: “The period for fixing the rights of the parties is the death of the decedent.” In the final adjustment of the distribution other questions may arise. It is not intended here to conclude them. The judgment of the Chancellor on the point made in the third ground of appeal is affirmed.
*117 The defendant, Steele, must, of course, account for all the assets of each of the estates which he undertook to administer. If he converted the specific assets or any of them into securities, he must account for the proceeds of such securities as he realized them by collections. Such as having failed to collect, he still holds, he has a right to turn over to the distributees in his own discharge, (if they insist upon present distribution,) if he can justify his failure to collect them, by showing reasons for retaining them in specie, sufficient in law for this purpose. Eor loss resulting from any want on his part, of reasonable care and diligence in taking these securities originally, or letting them lie inactive subsequently, he is of course, responsible. But this question made in ihe fourth ground of appeal, has not yet been concluded by any judgment in the case. On the contrary the Commissioner says in his report: “ He ” (the administrator) “ should proceed with all due diligence, to collect the outstanding debts due to the said estates, and satisfy the existing demands against the same.” When he shall have completed his administration to the extent of paying all demands of creditors so far as the assets will extend, and the residue is ready for distribution, the question of his ultimate liability for any of these securities then remaining uncollected, will perhaps arise for final adjudication. The claim made by the plaintiffs on the circuit, seems to have been that the administrator should be charged with the whole sale-bill, merely for the reason that he had according to a very common error, so charged himself in his returns, and not , that the uncollected • securities taken at the sale, as otherwise forming part of the assets, should be charged against him, because of want of proper care and diligence in taking or collecting them. The Chancellor properly disallowed the claim as made. That which is now preferred in this fourth ground of appeal, stands open for further adjustment.
*118 • The account of the administration of the defendant, George Steele, made up by the Commissioner, and contained in the brief, very clearly shows that, prior to the 1st April, 1863, his collections in money from the assets proper of the estate of William McLure were very small, and wholly inadequate for the payment of debts; so much so that, for this purpose, it was necessary to transfer moneys from his collections on account of John McLure’s estate, to one-half of which, in any event of the then impending controversy, William McLure’s estate would be entitled. It is quite manifest, therefore, that the administrator did not, at any time during the month of March, 1863, have funds of William McLure’s estate proper, for investment in Confederate bonds or otherwise. It - is equally clear, however, from these accounts, that prior to the 1st April, 1863, the defendant, George Steele, who was also administrator of the estate of John McLure, had made large collections in money from the assets of that estate, amounting in all to something more than $11,000. A large part, if not the whole of these collections, were the proceeds of the sale of Rose and her descendants. The great controversy of the suit then pending, and not until now finally adjudicated, was, whether the slaves were the separate property of William McLure’s estate, or were the estate of John McLure, to only one-half of which William’s estate was entitled. The answer of the defendant, Steele, is not before this Court, but it appears from the testimony, that during the lifetime of William and Robert, he, as the friend and creditor of both, advised them that in his opinion,, the estate of each would, after Robert’s death, be entitled to one-half of these slaves. The existence of this controversy was a sufficient reason why the administrator, Steele, should retain the moneys collected for John McLure’s estate, undistributed, or at least, one-half of them. No question has been made touching the administrator’s care and diligence *119 in collecting the sale notes and other asssets of John McLure’s estate, when he did and in the currency in which they were paid. Having certainly more than $5,500, of the money so collected in his hands, which he could not safely apply in a course of administration, it was his duty to invest such otherwise idle money, and the particular form of investment in Confederate bonds, was in conformity with his duty, as has been now repeatedly held by this Court. The testimony is quite satisfactory that such investment, of $5,500 in all, was in fact made, “ on account of the estates of William and Robert,” but there is no testimony proving what proportion of this sum was invested for the separate estate of each. An investment of the funds of John McLure’s estate would in effect be an investment for the several estates of William and Robert, in some then unascertained proportion, in any event of the litigation,' if there was any estate of John other than the slaves in dispute. That the defendant, Steele, had in his hands for investment of the moneys of John McLure’s estate, during the month of March, 1863, so much as $5,500; that he invested that sum of such moneys in Confederate bonds during that month, and that under the circumstances this was a proper investment, this Court is well satisfied. But the very cause which detained this fund undistributed in the administrator’s hands, and constituted the occasion for its investment, forbade his undertaking in advance virtually to decide the controversy, by carrying to the credit of, and investing for William McLure’s estate, a larger share than one-half of such moneys. As the event has proved that only one-half of those moneys belonged to AYilliam’s estate, as the case then stood he could not in a due course of administration have transferred more than one-half to that estate. It is difficult to understand why, entertaining the opinion which he did, he would have done so. If, therefore, he did what he only ought to have done, *120 or could have done, the figures demonstrate that he had not at any time during March, 1863, in hand for William's estate, including its half of John’s moneys theretofore collected, for investment, more than $1,800 or $1,900. He could not therefore have invested $4,000 of the moneys of William's estate in Confederate bonds in March, 1863.
An account of the defendant, Steele’s, administration, of John McLure’s estate, should have been made up by the Commissioner, and in that account the defendant should have had credit for the whole investment of $5,500 in Confederate bonds in March, 1863, and that account should have been carried on to the closing of the controversy between the two estates of William and Robert, by the present judgment of this Court, against the exclusive claim of these plaintiffs, on behalf of William’s estate, to the whole proceeds of Rose and her descendents, and the balance found in the administrator’s hands upon the closing of that account should be divided in equal shares between the two estates of William and Robert. The accounts of the administrator of each of these latter estates, limited to the proper assets belonging to it, (independent of John’s estate,) and the payments on its account should also be made up to the same time. In this way the whole will be properly adjusted according to the rights of the parties.
It is ordered that the Commissioner restate the accounts in conformity -with this opinion. With this modification, the circuit decree is affirmed.
Dunkin, C. J., and W ardlaw, A. J., concurred.

Decree modified.